JOHN W. HUBER, United States Attorney (#7226)
CY H. CASTLE, Assistant United States Attorney (#4808)
MARK E. WOOLF, Assistant United States Attorney (WA Bar #39399)
Attorneys for the United States of America
111 South Main Street, Ste. 1800 | Salt Lake City, Utah 84111
Tel: (801) 524-5682 | Fax: (801) 325-3399 | Cy.Castle@usdoj.gov | Mark.Woolf@usdoj.gov

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. |
| Plaintiff, | |
| vs. | VERIFIED COMPLAINT FOR FORFEITURE *IN REM* |
| $468,252.34 from American First Credit Union account ending in ***228-6.7; and Other Assets Described in Attachment A, | Judge |
| Defendants *in Rem*. | |

Pursuant to Supplemental Rule G(2) of the Federal Rules of Civil Procedure, the United States of America states this *in rem* action for forfeiture alleging as follows:

## NATURE OF THE ACTION

1. This is a judicial forfeiture action under 18 U.S.C. §§ 981(a)(1)(A) and 981(a)(1)(C) seeking forfeiture of the Defendant Properties more particularly described at Paragraph 9 herein.

2. The Defendant Properties are subject to forfeiture under 18 U.S.C. § 981(a)(1)(A), which provides that "[a]ny property, real or personal, involved in a transaction or attempted transaction in violation of [18 U.S.C. §§] 1956, 1957 or 1960 . . . or any property traceable to such property" is forfeitable to the United States. The Defendant properties were involved in transactions, attempted transactions, or are property traceable to such property in

violation of 18 U.S.C. §§ 1956(a)(1)(A)(i) and 1957, and are therefore subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A).

3.      The Defendant Properties are subject to forfeiture under 18 U.S.C. § 981(a)(1)(C), which provides that "any property, real or personal, which constitutes or is derived from proceeds traceable to . . . any offense constituting 'specified unlawful activity' (as defined in [18 U.S.C. §] 1956(c)(7))" is forfeitable to the United States. Section 1956(c)(7) defines, *inter alia*, "specified unlawful activity" as "any act or activity constituting an offense listed in [18 U.S.C. §] 1961(1)[.]" Both 18 U.S.C. § 1952 and 18 U.S.C. § 1343 are offenses listed in Section 1961(1). Accordingly, the Defendant Properties are subject to forfeiture under 18 U.S.C. § 981(a)(1)(C) because they constitute or are derived from proceeds traceable to violations of 18 U.S.C. §§ 1952 and 1343.

4.      As necessary, the United States will rely on 18 U.S.C. § 984 to forfeit the full amount of illicit proceeds originally deposited into any account in a financial institution. Section 984 provides that identical property found in the same place or account of property that is otherwise forfeitable can be forfeited regardless of whether the United States can establish, such as through direct tracing, that the illicit proceeds remain in the account, as long as the forfeiture action is commenced within a year of less from the date the offenses occurred.

## JURISDICTION AND VENUE

5.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1345 because this is a civil action commenced by the United States. This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1355(a) because this is an "action or proceeding for . . . forfeiture[.]"

6.      This Court has *in rem* jurisdiction pursuant to 28 U.S.C. § 1355(b) and (d).

2

7.      Venue is proper in this Court pursuant to 28 U.S.C. § 1355(b)(1)(A) because the District of Utah is "the district in which any of the acts or omissions giving rise to the forfeiture occurred[.]" Venue is also proper pursuant to 28 U.S.C. § 1395 because the forfeiture accrued in this district.

## PARTIES

8.      Plaintiff is the United States of America.

9.      Defendants *in rem* (referred to as "Defendant Properties" throughout this Verified Complaint) are more particularly described as follows:

   a.   $468,252.34 seized in Ogden, Utah from American First Credit Union ("AFCU") account ending in ***228-6.7 pursuant to a seizure warrant;

   b.   $22,736.22 seized in Ogden, Utah from AFCU account ending in ***228-6.9 pursuant to a seizure warrant;

   c.   $5,819.95 seized in Ogden, Utah from AFCU account ending in ***480-4.9 pursuant to a seizure warrant;

   d.   $233,425.41 seized in Ogden, Utah from AFCU account ending in ***077-7.9 pursuant to a seizure warrant;

   e.   $2.91 seized in Ogden, Utah from AFCU account ending in ***335-8.9 pursuant to a seizure warrant;

   f.   $99,319.86 seized in Ogden, Utah from AFCU account ending in ***046-4.9 pursuant to a seizure warrant;

   g.   $2,970.35 seized in Phoenix, Arizona from Wells Fargo Bank account ending in ***8679 pursuant to a seizure warrant;

h.  $64,165.93 seized in Ogden, Utah from AFCU account ending in ***332-0.9 pursuant to a seizure warrant;

i.  $54,164.94 seized in Ogden, Utah from AFCU account ending in ***692-0.9 pursuant to a seizure warrant;

j.  $224,379.15 seized in Ogden, Utah from AFCU account ending in ***223-1.9 pursuant to a seizure warrant;

k.  2014 Mercedes Benz S550V4, VIN # WDDUG8FB0EA062249, seized in La Jolla, California pursuant to a seizure warrant;

l.  DRD Paratus .308 rifle, Serial Number 0064, seized in Cottonwood Heights, Utah pursuant to a seizure warrant;

m.  Tiffany & Co. Platinum .90ct round brilliant diamond earrings, seized in San Diego, California pursuant to a seizure warrant;

n.  Tiffany & Co. Platinum, 18k yellow gold, emerald and diamond ring with one emerald weighing 1 carat, flanked by triangular brilliant cut diamonds weighing approximately .40ctw, G-H color range, VSI-VS2 clarity range, seized in San Diego, California pursuant to a seizure warrant;

o.  18k drop earrings with 16 rose cut pear-shaped diamonds 9.51ct that have diamond halos (311 RB dias total) 2.89ct (12.40CTW), seized in San Diego, California pursuant to a seizure warrant;

p.  18k flower shaped ring with pear-shaped brown diamonds 6.38CTW 1-RND brilliant diamond in the center .32CTW & 199 RND MELEE dias around brown dias & along shank 1.00CTW, seized in San Diego, California pursuant to a seizure warrant;

q. $7,506.97 seized in Riverdale, Utah from AFCU account ending in \*\*\*421-3.9 pursuant to a seizure warrant;

r. $4,259.34 seized in Riverdale, Utah from AFCU account ending in \*\*\*421-3.1 pursuant to a seizure warrant;

s. $7.607.20 seized in Riverdale, Utah from AFCU account ending in \*\*\*165-9.9 pursuant to a seizure warrant;

t. $803.80 seized in Riverdale, Utah from AFCU account ending in \*\*\*165-9.1 pursuant to a seizure warrant;

u. $7,211.45 seized in Riverdale, Utah from AFCU account ending in \*\*\*112-1.9 pursuant to a seizure warrant;

v. $2,556.02 seized in Riverdale, Utah from AFCU account ending in \*\*\*112-1.1 pursuant to a seizure warrant;

w. $1,769.62 seized in Riverdale, Utah from AFCU account ending in \*\*\*371-8.9 pursuant to a seizure warrant;

x. $7,849.46 seized in Riverdale, Utah from AFCU account ending in \*\*\*371-8.1 pursuant to a seizure warrant;

y. $14,291.38 seized in Riverdale, Utah from AFCU account ending in \*\*\*748-9.9 pursuant to a seizure warrant;

z. $2,305.88 seized in Riverdale, Utah from AFCU account ending in \*\*\*748-9.1 pursuant to a seizure warrant;

aa. $2,843.47 seized in Riverdale, Utah from AFCU account ending in \*\*\*126-1.9 pursuant to a seizure warrant;

bb. $671.71 seized in Riverdale, Utah from AFCU account ending in ***126-1.1 pursuant to a seizure warrant;

cc. $8,981.81 seized in Riverdale, Utah from AFCU account ending in ***125-3.9 pursuant to a seizure warrant;

dd. $4,520.96 seized in Riverdale, Utah from AFCU account ending in ***125-3.1 pursuant to a seizure warrant;

ee. $9,168.85 seized in Riverdale, Utah from AFCU account ending in ***625-6.9 pursuant to a seizure warrant; and

ff. $7,588.29 seized in Riverdale, Utah from AFCU account ending in ***625-6.1 pursuant to a seizure warrant.

10. The Defendant Properties, identified at Paragraphs 9(a) through 9(j), correspond to bank accounts seized by the FBI from either AFCU or Wells Fargo Bank and have been turned over to the United States Marshals Service in Salt Lake City, Utah, deposited in the United States Marshals' Seized Asset Deposit Fund Account, and remain in the care, custody, and control of the United States Marshals Service in Salt Lake City, Utah.

11. The 2014 Mercedes Benz, identified at Paragraph 9(k), was seized by the FBI in La Jolla, California on or about October 25, 2019. The vehicle was turned over to the United States Marshals Service, which has maintained custody, possession, and control of the vehicle by storing it at the United States Marshal's Service Warehouse Facility in San Diego, California. The DRD Paratus .308, identified at Paragraph 9(l), was seized by the FBI on or about October 25, 2019 in Cottonwood Heights, Utah, and the rifle remains in the custody, possession, and control of the FBI in Salt Lake City, Utah.

12.     The FBI seized the Defendant Properties identified at Paragraphs 9(m) through 9(p) pursuant to a seizure warrant executed in San Diego, California, and turned the assets over to the United States Marshals Service. The United States Marshals Service, in turn, has maintained custody, possession, and control of the assets at a facility where the United States Marshal's Service stores seized jewelry in Pflugerville, Texas.

13.     The Defendant Properties, identified at Paragraphs 9(q) through 9(ff), correspond to bank accounts seized by the FBI from AFCU and have been turned over to the United States Marshals Service in Salt Lake City, Utah, deposited in the United States Marshals' Seized Asset Deposit Fund Account, and remain in the care, custody, and control of the United States Marshals Service in Salt Lake City, Utah.

## FACTS SUPPORTING FORFEITURE

### FedEx Ground

14.     FedEx Ground Package System, Inc. ("FedEx Ground") is an information and distribution network operating throughout the United States and Canada. As part of its operation, FedEx Ground contracts with independent trucking companies, or Contract Service Providers ("CSPs"), to facilitate package delivery services. FedEx Ground has over thirty regional "hubs" or large operational centers in the United States where FedEx Ground trailers are loaded with packages and shipped throughout the United States. One such operational center, Hub #841, is located at 720 North 400 West, North Salt Lake City, UT ("Utah FedEx Ground Hub"). Like other hub locations, Utah FedEx Ground Hub has a Senior Linehaul Manager who is responsible for all FedEx Ground trucking operations at that location. Utah FedEx Ground Hub also has "line haul coordinators," more commonly known as "dispatchers," who are responsible for, among other things, daily assignment of unassigned runs to CSPs.

**FedEx Ground Contract Service Providers**

15.     FedEx Ground contracts with CSPs to execute "runs" for FedEx Ground.

16.     Each CSP must enter into a "Transportation Service Provider Agreement" with

FedEx Ground, which requires CSPs to do the following:

> [C]onduct all business activities with honesty and integrity, in accordance with applicable law and in a professional and safe manner at all times.
>
> [R]epresent and warrant it is a corporation (and not some other form of business, such as a limited liability partnership (LLP), limited liability company (LLC), limited liability corporation, association, joint stock company, joint stock association, or similar entity), that it is incorporated in a state in the United States of America and registered as a corporate business entity in good standing and as an employer in the states in which it does business.
>
> All personnel assigned to operate or be in a commercial motor vehicle will meet all applicable background, training and safety operating standards.
>
> To prepare daily driver logs and to accurately track and report the actual mileage traveled.

17.     The failure of any CSP to comply with one or more these requirements can result

in the termination of their business relationship with FedEx Ground.

**FedEx Ground Runs**

18.     CSPs can obtains runs from FedEx Ground in multiple ways. A CSP can purchase

runs from other CSPs, or can apply for runs by obtaining unit numbers and runs from FedEx

Ground. Each unit number is assigned to a specific truck. FedEx Ground assigns additional unit

numbers for each additional truck or run an existing CSP obtains. Only a truck assigned to a

specific CSP can service a run assigned to that CSP.

19.     FedEx Ground has three primary types of runs: (1) assigned runs, (2) unassigned runs, and (3) assigned temporary runs. "Assigned runs" have set origins and set destinations. They are the most valuable FedEx Ground runs with retail market values ranging from approximately $100,000 to $250,000. "Unassigned runs" have set origins but no set destinations, and mileage varies day-to-day. The FedEx Ground dispatchers assign these runs on a rotating basis. Unassigned runs routinely sell among other CSPs, though they are less valuable than assigned runs. "Assigned temporary runs" have a set origin and destination, but are runs FedEx Ground is testing, usually in 90-day increments, to determine whether the runs should become permanent assigned runs. If approved by FedEx Ground engineers at FedEx Ground's corporate offices in Pennsylvania, Senior Linehaul Managers are required to publicly post new assigned runs to allow existing CSPs to compete based upon the number of points they have accumulated.

**FedEx Ground Point System**

20.     FedEx Ground employs a point system for all CSPs servicing unassigned and assigned runs. The point system is used by FedEx Ground to evaluate performance, determine whether to maintain a business relationship, and to award new runs. To obtain a new assigned run, a CSP must accumulate points to successfully acquire or bid on a run when a new assigned run becomes available. From approximately 2014 to present, CSPs could earn one point a day for each truck assigned a run. Trucks could also earn up to 30 additional points a week during peak season. Trucks could also lose points for various reasons, such as failing to drive a contractually obligated run, failing to deliver a load on time, failing to pass a safety inspection, or failure to avoid a preventable accident. In every CSP contract, FedEx Ground and the CSP agree upon established rules and procedures by which a new assigned run will be awarded. As such, the awarding of an assigned run should be based on merit.

9

**FedEx Ground Scaling Policy**

21.     To ensure continuity of operations, FedEx Ground has an "over scale" policy,

limits CSPs, or a person with "common control" or ownership of multiple CSPs, to operate no

more than fifteen runs out of a single hub. CSPs must obtain specific approval from FedEx

Ground to operate over scale, and may not circumvent this policy by obtaining runs in another

company's name.

**FedEx Code of Conduct**

22.     According to the FedEx Code of Conduct, all FedEx Ground employees are

prohibited from receiving the following:

> Gifts with a combined value of more than US $75 per year from the
> same current or prospective contractor, supplier, customer or any
> other person with whom FedEx does or may do business ("Third
> Party") without the prior approval from [the] . . . company's General
> Counsel.

> Gifts of cash or cash equivalents (such as gift cards or gift
> certificates) must never be offered or received.  In addition, [a FedEx
> employee] . . . must never solicit a gift or entertainment.

> FedEx does not tolerate making payments or payments-in-kind
> (gifts, favors, etc.) to any person or organization to influence that
> person or organization to award business opportunities to us or to
> make a business decision in our favor.

> Bribes, kick-backs, secret commissions and similar payments to any
> person or organization are strictly prohibited.  Moreover, they may
> expose FedEx and its employees and contractors to criminal
> prosecution and serious penalties under U.S. law and the laws of
> other countries.

**Utah FedEx Ground Hub Employees**

23.     At all times relevant to this complaint, Ryan L. Mower ("Mower") was the Senior

Linehaul Manager for Utah FedEx Ground Hub. Mower was FedEx Ground's highest-ranking

employee in Utah. His primary responsibilities included overseeing the FedEx Ground CSPs and

ensuring each complied with FedEx Ground policies and regulations.

24.     Jonathan "Kirk" Glancy ("Glancy") was a weekend dispatcher for FedEx Ground at the Utah FedEx Ground Hub. His direct supervisor was Mower. Glancy's responsibilities included assigning assigned temporary runs and unassigned runs to CSPs. In or about 2013-2014, Glancy began working for the Salt Lake Trucking Group ("SLTG") while he was also working for Utah FedEx Ground Hub. SLTG had numerous FedEx Ground CSPs in Utah, many of which were CSPs for Utah FedEx Ground Hub. Glancy eventually left Utah FedEx Ground Hub to work exclusively for SLTG.

25.     At all times relevant to his participation in the bribery scheme alleged herein, Jeffrey Horrocks ("Horrocks") worked for Utah FedEx Ground as a day shift dispatcher.

26.     At all times relevant to his participation in the bribery scheme alleged herein, Ryan "Jaime" Larson ("Larson") worked for Utah FedEx Ground Hub as a dispatcher.

**Salt Lake Trucking Group**

27.     SLTG began with trucking companies started by Alexsander Barsukov ("Barsukov") and/or Yevgeny Tuchinsky ("Tuchinsky"). In about 2009 and 2010, Baruskov and Tuchinsky formed multiple trucking companies that operated as FedEx Ground CSPs.

28.     While not called SLTG at the time, in or about 2010-11, Barsukov and Tuchinsky continued to operate non-FedEx Ground related trucking companies along with their newly established FedEx Grounds CSPs out of the same business location. At or about this same time, SLTG's various CSP related trucking businesses and non-FedEx Ground trucking businesses merged, resulting in the formation of two primary divisions – the FedEx Ground Division ("SLTG FedEx Division") and the Over-the-Road Division ("OTR Division").

29.     In about 2012, Konstantin Tomilin ("Tomilin") became a partner in the SLTG FedEx Division.

30.     In about 2014, Leonid Teyf ("Teyf") also became a partner in the SLTG FedEx Division.

31.     In or about 2010 to 2011, Felix Tsipelzon ("Tsipelzon") became the general manager of SLTG FedEx Division and was responsible for its day-to-day operations.

32.     In or about 2015, SLTG formed the Salt Lake Trucking Group, LLC as an umbrella entity for all of the trucking companies in the SLTG FedEx Division and the OTR Division.

33.     SLTG and its various trucking companies operated in interstate commerce, conducting numerous runs on behalf of FedEx Ground across state lines. According to banking records, SLTG FedEx Division trucking companies were paid by FedEx Ground via wire and/or electronic transfer of funds.

**SLTG Owners**

34.     Tuchinsky was born in Ukraine and came to the United States in 1990 as a refugee. He started Eugeny Trucking, which later became Eugene Trucking in about 2010.

35.     Barsukov was born in Belarus and came to the United States as a parolee on an LA6 Visa. He began working with FedEx Ground as a contractor as early as about 2000.

36.     Teyf was born in Belarus and came to the United States in 2010. In or about 2014, Teyf purchased an interest in SLTG FedEx Division for several million dollars.

37.     Tomilin was born in the former Soviet Union.  He has lived between the United States and Russia for the past several years. Tomilin invested with Barsukov and Tuchinsky to become a co-owner in the SLTG FedEx Division. Subsequently, Teyf purchased Tomilin's

interest in the SLTG FedEx Division.

38.     Tsipelzon was born in Moldova and came to the United States as a refugee.

Tsipelzon was the general manager of the SLTG FedEx Division.

**The SLTG FedEx Division - CSPs**

39.     The SLTG FedEx Division included the following FedEx Ground CSPs, each of

which operated in interstate commerce:[1]

| Utah Corporation | Officers/Directors as of 03/19/2019 |
|---|---|
| A & B Transportation, Inc. ("A&B") | Barsukov, Tuchinsky, Teyf, and Glancy |
| A & Y Transportation, Inc. ("A&Y") | Barsukov, Tuchinsky, Teyf. and Glancy |
| American Star Transport, Inc. ("American Star") | Barsukov, Tuchinsky, and Teyf and Glancy |
| Big Dogs Transport, Inc. ("Big Dogs") | Glancy, Tsipelzon, Jon Glancy and Phillip Glancy |
| Costa Transportation, Inc. ("Costa") | Barsukov, Tuchinsky, Teyf, and Glancy |
| Eugene Trucking, Inc. | Barsukov, Tuchinsky, Teyf, and Glancy |
| Falanga Transport, Inc. ("Falanga") | Barsukov, Tuchinsky, Teyf, and Glancy |
| Fusion Transport, Inc. ("Fusion") | Barsukov, Tuchinsky, Tsipelzon, Phil Glancy, Alona Matveyenko, Andrew Glancy, and Glancy |

40.     SLTG also had the following ancillary businesses that facilitated its trucking

activities: (1) Salt Lake Diesel Repair, which provided diesel repair services primarily for SLTG

trucks; and (2) Salt Lake Driving Academy, which was a truck driving school that provided

training for SLTG's truck drivers.

**SLTG FedEx Division Operated as One Company**

41.     From 2009 through at least October 2019, SLTG FedEx Division operated as a

single company with commingled financial and business activities, including:

       a.    shared, common ownership,

       b.    operation from the same business location,

---

[1] SLTG FedEx Division operated two other CSPs, Lana Logistics and Perun Transportation, Inc., which are no longer operated by SLTG.

> c.  shared manager, accountants, truck drivers, dispatchers, recruiters, human resource personnel, safety managers, and maintenance managers,
>
> d.  shared trucks and shared FedEx runs, and
>
> e.  joint submission of credit applications to acquire new trucks.

42.     SLTG hired Hansen, Bradshaw, Malmrose and Erickson ("Hansen CPA"), a CPA firm, to conduct financial audits of its trucking companies. Hansen CPA was unwilling to provide individual financial statements for A&Y, A&B, Eugene and Costa because of the commingling of their business and financial activities. Instead, Hansen CPA provided a "consolidated financial statement" for these four companies.

43.     SLTG's website has portrayed SLTG as a partnership/merger of several trucking companies.

44.     SLTG's former CFO claimed, in pursuing cheaper workers' compensation insurance, that SLTG FedEx Division and OTR Division were represented to be one entity. SLTG's former CFO further advised that SLTG applied for truck loans using the OTR Division, but then assigned the new trucks to the SLTG FedEx Division. SLTG's former CFO advised that SLTG represented to FedEx Ground that it was seventeen different S-Corporations, but their financial and business activities were commingled as described above.

45.     Glancy, the President of SLTG, was interviewed by investigators on October 25, 2019, and he admitted the following:

> a.  that the SLTG FedEx Division shared the same dispatchers, safety manager, maintenance manager and recruiting and HR personnel,
>
> b.  that the safety manager at the SLTG oversaw the safety functions for all 14 trucking companies that made up of the FedEx Division and OTR Division,

14

    c.  that the payroll for SLTG office staff was paid by SLTG and each trucking company within SLTG was "renting" the various employees within SLTG based on the number of trucks each company had, and

    d.  that SLTG was used to purchase trucks and then lease them to the various trucking companies within SLTG.

**Bribery and Wire Fraud Scheme**

### *Bribery Payments to Mower*

46.    Beginning in or about late 2009 and continuing through at least January 2019, Barsukov, Tuchinsky, and Mower intentionally and knowingly devised an artifice or scheme to defraud FedEx Ground and other CSPs that sought to secure or bid on runs from FedEx Ground in Utah through a pervasive cash bribe payment scheme. During the course of the bribery and fraud scheme, Barsukov and/or Tuchinsky paid Mower cash bribes totaling approximately $300,000. Bank records from January 2012 to March 2018, show approximately $400,000 in cash deposits exceeding Mower's known, legitimate sources of income.

### *Bribery Payments to Horrocks and Larson*

47.    Beginning in or about late 2009, Barsukov and Tuchinsky also devised a bribery and fraud scheme with Horrocks and Larson, dispatchers at Utah FedEx Ground. This scheme involved bribes for each unassigned run that Horrocks and Larson awarded to the SLTG FedEx Division beyond runs the SLTG FedEx Division was entitled to receive for its CSPs. In an interview with investigators, Horrocks admitted that he and Larson had taken between 750 to 1,000 bribes from Barsukov, Tuchinsky and Tsipelzon. Larson also admitted that Barsukov and Tuchinsky paid him approximately 100 cash bribes for additional unassigned runs awarded to CSPs of SLTG FedEx Division.

*Mower's Preferential Treatment*

48.     In exchange for bribe payments, Mower provided the following preferential

treatment:

a.   Mower allowed SLTG to operate over scale in violation of FedEx Ground policy.

b.   Mower regularly provided SLTG with more unassigned runs than they were

entitled to under CSP agreements with FedEx Ground. For example, on July 8,

2018, Mower and Tsipelzon exchanged the following text messages:

> Tsipelzon: You think that "equitable situation" is already here?!! I'm seeing
> it.  You've gotta be kidding yourself when you say this isn't a
> catastrophe already.

> Mower:     Not kidding myself.  I have the facts.  You get way more work
> than the rules would allow.

> * * * * * * * *

> Mower:     You got 19 runs.  We had a total of 24 total.  You got almost 80%
> of the total amount of work, should have been closer to 50 or so to
> be equitable.  Not sure what your expectations are beyond that.  I
> don't have a magic wand.

c.   Mower allowed Glancy to violate FedEx Ground's conflict of interest and

moonlighting policies by ignoring his simultaneous work for FedEx Ground and

SLTG.

d.   Mower prevented SLTG trucks from losing FedEx Ground points by allowing

SLTG to submit altered and falsified accident reports, or no accident reports. For

example, on October 11, 2018, Mower and Tsipelzon exchanged text messages

about an accident involving one of SLTG's trucks in Industry, California:

> Tsipelzon: 137534 hit a poll today in Industry.  According to the driver (Jeff
> Berger) nobody saw the damage and there wasn't any damage to
> the poll.  There is a little damage to fender on our truck.  We didn't

> say anything and by the time Berger called Adam – he was already
> getting out of Industry.  We were gonna just fix this ourselves.
> Just got a call from Enos, he knows all about the damage.
> Someone in Industry send him the report.  Enos made it sound as if
> I have a choice if we want to file the yard accident.  I said, well if
> you giving me a choice – I don't wanna get hit a safety bonus and
> points, so yeah – we'll fix it ourselves.  And maybe it's just me and
> my paranoia, but Enos sounded weird when he called

Tsipelzon:   Correction, they didn't file the report in Industry, just called Enos
and send him all info with pictures

Mower:      You are paranoid I've gotcha cocerede (sic) Covered

On April 5, 2018, Mower exchanged several messages with Adam Leix ("Leix"),

the Safety Manager for SLTG, discussing Mower's agreement with SLTG to

falsely report accidents as "deer strikes":

Leix:       Do you have a second for me to report a debris/construction barrel
strike that happened with one our units? Or do you want me to call
one of your dispatchers for this?  It took out the air lines and did
some bumper damage.  This barrel was knocked in their path from
another vehicle up ahead of them.

Mower:      Is it super clear as such in the video?

Leix:       Standby checking

Leix:       No recording is showing up for this

Leix:       Sorry the drivers are saying no bumper damage

Leix:       It is with 137969 that happened this morning

Mower:      Report as deer strike then.  Super risky they will classify as
preventable otherwise.

e.   Mower fraudulently approved FedEx Ground's payment of additional miles

beyond the actual miles SLTG trucks drove. For example, on April 24, 2018,

Mower and Tsipelzon exchanged the following text messages:

> Mower:   I dispatched 141477 from salt to alba to Denver to oral.  2932 miles.  They are actually driving 2360 total.
>
> Tsipelzon:  thumbs up emoji, the words "you are so awesome," and a clapping hands emoji

f.   Mower fraudulently approved FedEx Ground's payment for miles or runs SLTG trucks did not actually drive. For example, on April 18, 2018, Mower and Tsipelzon exchanged the following text messages:

> Mower:   Looks like 135548 was paid a Denver round trip on 4/5 that did not take place.  Dispatch error.  I wont reverse the payment. That's $1850 for free.  Let Eugene know
>
> Tsipelzon:   Copy. Thank you. I'll tell him

g.   Mower awarded SLTG an assigned team run from Salt Lake City to St. Paul, Minnesota to Spokane, Washington without allowing other CSPs the opportunity to compete for the run as required by FedEx Ground policy.

h.   Mower allowed SLTG to obtain and then retain the following nine unauthorized assigned runs for five to six years that he should have classified as assigned runs and posted for other CSPs to compete for these runs:

   i.   One solo run from Salt Lake City to Parowan, Utah for a weekly total of about 2,400 miles and gross weekly income of approximately $4,000.

   ii.   One solo run from Salt Lake City to Lima, Montana to Salt Lake City for a weekly total of about 2,800 miles and gross income of approximately $4,700.

   iii.   Four solo runs from Salt Lake City to Umatilla, Oregon for a weekly total of about 10,000 miles and weekly gross income of approximately $17,000.

    iv.   Three team runs from Salt Lake City to St. Paul, Minnesota then to Spokane, Washington and back to Salt Lake City for a total of about 12,000 weekly miles for the 3 runs and approximately $20,000 in weekly gross income.

    v.   By text message dated May 10, 2018, Mower assured Tsipelzon that he would not post the nine unauthorized assigned runs that he had allowed SLTG to keep:

> Mower:    I am not going to post the 4 Umatilla, lima, parowan, 3/stpl/spok runs (one is assigned already) that you [Tsipelzon] are running.  There may be others.  Just letting you know.

49.    On February 26, 2019, Mower met with Tuchinksy and Barsukov and discussed the prior bribe payments they had made to Mower and having Mower purchase a 5 percent interest in SLTG FedEx Division.

50.    On February 27, 2019, Tuchinsky met with Mower and offered him a $50,000 bribe for each assigned run he could assign to SLTG that would be credited towards Mower's purchase of an interest in the SLTG.

**Financial Tracing of Specified Unlawful Activity Proceeds from the Scheme**

51.    Investigators interviewed Paul Melander ("Melander"), the Vice President of Transportation for FedEx Ground. Melander is authorized to terminate CSP contracts and FedEx Ground employees. Melander advised that if FedEx Ground had become aware of SLTG's bribes to FedEx Ground employees, it would have terminated the employees and its business relationship with SLTG's FedEx Division. As a result, SLTG FedEx Division should not have received the funds FedEx Ground paid them after SLTG began bribing Mower in about 2009. Thus, all the funds SLTG FedEx Division received from FedEx Ground during the bribery/fraud scheme period are fraudulently obtained proceeds.

52.     As described herein, the first identified bribes from Barsukov and Tuchinsky to Mower, Horrocks and Larson occurred in 2009 and continued through at least January of 2018, with additional bribes offered to Mower through February of 2019. For their financial investigation, investigators only had access to bank records and FedEx Ground payment history for the period January 1, 2012, to August 2, 2019 ("Analysis Period"). An analysis of deposits during the Analysis Period showed that the SLTG FedEx Division received approximately $108,000,000 in payments, made via wire and/or electronic transfer, from FedEx Ground after deductions for certain expenses such as fuel and trailer repairs.

53.     Where necessary to distinguish between FedEx Ground fraudulent proceeds and otherwise clean or unknown funds deposited to the trucking company accounts and traced to other accounts or assets, investigators used a percentage analysis or proportional method. Under this method, assets are subject to forfeiture in the same percentage the calculations show dirty funds are present in an asset. Courts have recognized the validity of this approach.

### Deposit Accounts

54.     Investigators identified 16 AFCU bank accounts that received weekly deposits from FedEx Ground (hereafter "Deposit Accounts"). Deposits were received by electronic and/or wire transfer from FedEx Ground. During the Analysis Period, the Deposit Accounts were funded largely by FedEx Ground deposits and intercompany transfers. Based on the commingled operation of SLTG FedEx Division, investigators considered the intercompany transfers as reallocations of FedEx Ground deposits rather than as new income.

55.     The below table indicates the percentage of deposits in each Deposit Account tied to FedEx Ground (including the percentage related to intercompany transfers):

| Account No. | Owner | % of Deposits Tied to FedEx Ground |
|---|---|---|
| ***421-3.9 | A&B | 94.50% |
| ***421-3.1 | A&B | 90.43% |
| ***165-9.9 | A&Y | 97.65% |
| ***165-9.1 | A&Y | 99.80% |
| ***112-1.9 | American Star | 94.90% |
| ***112-1.1 | American Star | 77.49% |
| ***371-8.9 | Big Dogs | 92.57% |
| ***371-8.1 | Big Dogs | 87.63% |
| ***748-9.9 | Costa | 90.49% |
| ***748-9.1 | Costa | 96.93% |
| ***126-1.9 | Eugene Trucking Inc | 96.17% |
| ***126-1.1 | Eugene Trucking Inc | 81.01% |
| ***125-3.9 | Falanga | 97.64% |
| ***125-3.1 | Falanga | 99.96% |
| ***625-6.9 | Fusion | 94.72% |
| ***625-6.1 | Fusion | 99.96% |

***Traced Proceeds Accounts (Section 984 Seizures) in Personal Accounts***

56.     From October 25, 2018, through October 25, 2019, Barsukov, Tuchinsky, Tomilin, Teyf, and Tsipelzon received criminal proceeds from the Deposit Accounts into their personal accounts. The personal accounts correspond to the Defendant Properties identified at Paragraphs 9(a) through 9(g) of this Verified Complaint. To account for the small percentage of funding in the Deposit Accounts that came from unknown sources, investigators averaged the percentage of funds tied to FedEx Ground in those accounts. This calculation showed that, on average, the Deposit Accounts contained 90 percent criminal proceeds. This percentage was then applied to the total deposits in each of the personal accounts received from the Deposit Accounts to obtain the following 18 U.S.C. § 984 seizure amounts:

| Bank | Account No. | Owner | Section 984 Seizure Amount |
|---|---|---|---|
| AFCU | ***228-6.9 | Aleksandr Barsukov / Yelena Matveyenko | $392,242.84 |
| AFCU | ***480-4.9 | Alona Matveyenko / Yelena Matveyenko | $29,397.47 |
| AFCU | ***077-7.9 | Leonid Teyf | $600,627.63 |
| AFCU | ***335-8.9 | Yevgeny Tuchinsky/ Vladimir Istomin | $331,372.99 |
| AFCU | ***046-4.9 | Felix Tsipelzon | $106,739.93 |
| WFB | ***8679 | Tuchinksy, Yevgeny/ Borovik, Leyla | $15,538.82 |

57.     Investigators identified an additional $98,745.72 subject to seizure under Section 984 that was deposited into Barsukov's checking and savings account, AFCU ***228-6.9 (checking) and AFCU ***228-6.7 (savings), between October 25, 2018 and October 25, 2019. During that period, the savings account's only funding source was the checking account, so it simply operated as an extension of that account.

58.     On or about October 15, 2019, Barsukov sold his real property located at 3555 E. Sutton Court, Sandy, Utah ("Sutton Court Property") to Carlos Martin Almiron and Deysi Adali Rivera. The Sutton Court Property was paid off on or about August 28, 2012, using $405,612.30 from Barsukov's personal AFCU savings account ending in 228-6.7, which received 42% of its funds from the Deposit Accounts, making at least $170,357 traceable to criminal proceeds. However, the funds in AFCU savings account ending in 228-6.7, at the time of the August 28, 2012 payoff, also included $400,000 that Tomilin admitted he paid to Barsukov to obtain Tomlin's partnership interest in SLTG, making the October 15, 2019 payoff transaction a money laundering transaction involving criminal proceeds in violation of 18 U.S.C. § 1957.

59.     As part of the October 15, 2019 Sutton Court Property purchase, the buyers wired $98,745.72 to Barsukov's AFCU checking account ending in 228-6.9. That same day, $75,000 was wired to Barsukov's AFCU savings account ending in 228-6.7. Consequently, an additional $98,745.72 is subject to seizure from AFCU 228-6.9 as property involved in money laundering

in addition to the $392,242.84 sought for seizure, as identified in Paragraph 56 above, for a total seizure from Barsukov's checking and savings account of $490,988.56.

60.     On or about October 24, 2019, Chief Magistrate Judge Paul M. Warner issued a seizure warrant related to the personal accounts, and the United States seized the following funds:

| Bank | Account No. | Seized Amount |
|------|-------------|---------------|
| AFCU | ***228-6.7 | $468,252.34 |
| AFCU | ***228-6.9 | $22,736.22 |
| AFCU | ***480-4.9 | $5,819.95 |
| AFCU | ***077-7.9 | $233,425.41 |
| AFCU | ***335-8.9 | $2.91 |
| AFCU | ***046-4.9 | $99,319.86 |
| WFB | ***8679 | $2,970.35 |

### Funds Involved in Promotion Money Laundering

61.     Investigators also traced criminal proceeds from the Deposit Accounts into AFCU accounts owned by Salt Lake Diesel Repair, Salt Lake Driving Academy, and Salt Lake Trucking Group, LLC. These accounts correspond to Defendant Properties identified at Paragraphs 9(h) through 9(j) of this Verified Complaint. SLTG used these companies to facilitate certain aspects of their trucking operations.

62.     Without the repair services of Salt Lake Diesel Repair and the driver training provided by Salt Lake Driving Academy, SLTG would not have the trucks or drivers to operate the FedEx Ground runs it obtained through its scheme.

63.     SLTG used Salt Lake Trucking Group, LLC to make monthly payments on its trucks. From February of 2018 through March of 2019, Salt Lake Trucking Group, LLC made monthly truck payments totaling about $2.3 million using its AFCU account ending in 223-1.9. These payments were funded by transfers from the Deposit Accounts and OTR Division

accounts. Making monthly truck payments to retain their trucks was necessary for the SLTG to keep performing their FedEx Ground runs.

64.     Consequently, the funds SLTG transferred to accounts owned by each of these three facilitating companies were done so with the intent to promote SLTG's bribery and fraud scheme.

65.     From October 25, 2018, to October 25, 2019, Salt Lake Diesel Repair's AFCU 332-0.9 received $71,295.48 in funds from the Deposit Accounts. Applying the 90% average percentage of FedEx Ground funds in the Deposit Accounts results in funds up to $64,165.93 in AFCU account ending in 332-0.9 being subject to forfeiture under 18 U.S.C. § 984.

66.     From October 25, 2018, to October 25, 2019, Salt Lake Driving Academy's AFCU 692-0.9 received $66,908.12 in funds from the Deposit Accounts. Applying the 90% average percentage of FedEx Ground funds in the Deposit Accounts results in funds up to $60,217.31 in AFCU account ending in 692-0.9 being subject to forfeiture under 18 U.S.C. § 984.

67.     From October 25, 2018, to October 25, 2019, Salt Lake Trucking Group, LLC's AFCU 223-1.9 received $980,179.85 in funds from the Deposit Accounts. Applying the 90% average percentage of FedEx Ground funds in the Deposit Accounts results in funds up to $882,161.87 in AFCU account ending in 223-1.9 being subject to forfeiture under 18 U.S.C. § 984.

68.     On or about October 24, 2019, Chief Magistrate Judge Paul M. Warner issued a seizure warrant related to these accounts used for promotion of money laundering, and the United States seized the following funds:

| Bank | Account No. | Seized Amount |
|------|-------------|---------------|
| AFCU | 692-0.9 | $54,164.94 |
| AFCU | 223-1.9 | $294,379.15 |
| AFCU | 332-0.9 | $64,165.93 |

### *Purchase of 2014 Mercedes Benz S550V4*

69.      Investigators traced FedEx Ground proceeds into a 2014 Mercedes Benz S550V4, VIN # WDDUG8FB0EA062249 ("Mercedes"), identified as a Defendant Property at Paragraph 9(m). To determine the amount of criminal proceeds involved in this purchase, investigators identified the involved bank accounts used for the purchase and then applied the average percentage of FedEx proceeds deposited into those accounts during the Analysis Period.

70.      On or about April 18, 2014, Barsukov purchased the Mercedes for $121,178. Investigators traced $5,000 towards this purchase to A&B's American Express Card ending in 4-61001. The card balance that included this transaction was paid with the Deposit Account ending in ***421-3.9, which received 94% of its funds from FedEx Ground making $4,700 traceable to criminal proceeds. A final charge of $2,163.59 was traced to A&B's American Express Card ending in 4-61001. The card balance that included this transaction was paid by the Deposit Account ending in ***165-9.9, which received 97% of its funds from FedEx Ground making an additional $2,098.68 traceable to criminal proceeds.

### *Personal Property/Luxury Item Purchases*

71.      Investigators also traced FedEx Ground proceeds into several other asset purchases using the same method as described in Paragraph 69 herein.

72.      On or about August 26, 2014, Barsukov purchased a DRD Paratus .308 rifle, SN 0064, identified as a Defendant Property in Paragraph 9(l), for $5,175.90 using his American Express Card. The balance on this card that included the transaction was paid off with a

$24,648.80 payment from the Deposit Account ending in 165-9.9, which received 97% of its funds from FedEx Ground making $23,909.34 traceable to criminal proceeds. Since the purchase of this Defendant Property includes a transaction that involved more than $10,000 in proceeds from specified unlawful activities, the Defendant Property is also subject to forfeiture as involved in money laundering under 18 U.S.C. § 1957

73.     On or about October 6, 2012, Tuchinsky purchased a Platinum .90ct  Round Brilliant Diamond Earrings, identified as a Defendant Property at Paragraph 9(m), from Tiffany and Co. for $26,075.50 using his Eugene Trucking American Express Card. The balance on this card that included this transaction was paid off with $10,000 and $23,735.16 payments from the WFB Deposit Account ending in 1695, which received 78% of its funds from FedEx Ground, making $7,800 and $18,513.42 traceable to criminal proceeds. Since the purchase of this Defendant Property includes a transaction that involved more than $10,000 in proceeds from specified unlawful activities, the Defendant Property is also subject to forfeiture as involved in money laundering under 18 U.S.C. § 1957.

74.     On or about July 28, 2014, Tuchinsky purchased an 18kt Yellow Gold, Emerald and Diamond ring with one Emerald weighing 1 carat, flanked by triangular Brilliant cut Diamonds weighing approx .40CTW, G-H color range, VS1-VS2 clarity range, identified as a Defendant Property at Paragraph 9(n), from Tiffany and Co. for $15,660 using his Eugene Trucking American Express Card. The balance on this card that included this transaction was paid off with a $43,408.42 payment from the WFB Deposit Account ending in 1695, which received 78% of its funds from FedEx Ground making $33,858.57 traceable to criminal proceeds. Since this transaction involved more than $10,000 in proceeds from specified unlawful activities, this Defendant Property is also subject to forfeiture as involved in money laundering

under 18 U.S.C. § 1957.

75.     On or about March 16, 2013, Eugene Tuchinsky purchased 18kr drop earrings w/16 Rose cut Pear-shaped Diamonds 9.51ct that have Diamond halos (311 RB dias total) 2.89ct (12.40CTW) and 18ky Flower shaped ring w/Pear-shaped brown Diamonds 6.38CTW 1-RND Brilliant Diamond in the center .32CTW & 199 RND MELEE dias around brown dias & along shank 1.00CTW, identified as Defendant Property at Paragraph 9(o) and 9(p) respectively, from OC Tanner for $72,986.23 using his Eugene Trucking American Express Card. The balance on this card that included this transaction was paid off with a $77,986.23 payment from the WFB Deposit Account ending in 1695, which received 78% of its funds from FedEx Ground making $60,829.26 traceable to criminal proceeds. Since this transaction involved more than $10,000 in proceeds from specified unlawful activities, this Defendant Property is subject to forfeiture as involved in money laundering under 18 U.S.C. § 1957.

### *Traced Proceeds in Deposit Accounts*

76.     The Government also seeks to forfeit the "net profits" traced into the Deposit Accounts, which are listed at Paragraph 55 of this Verified Complaint, pursuant to 18 U.S.C. § 981(a)(2)(B). Section 981(a)(2)(B) specifically provides that "[f]or purposes of [18 U.S.C. § 981(a)(1)], the term 'proceeds' . . . [i]n cases involving lawful goods or lawful services that are sold or provided in an illegal manner . . . means the amount of money acquired through the illegal transactions resulting in the forfeiture, less the direct costs incurred in providing the goods and services."

77.     Investigators estimate the "net profits", or proceeds, from the bribery and fraud scheme that can be traced back to the Deposit Accounts at 11 percent from each account. Investigators arrived at this estimate of "net profits" based on a review and analysis of

QuickBooks records, tax returns, and profit and loss statements for the years 2013-2018. During this period SLTG FedEx Division's average net profit was 11 percent, which also takes into account the percentage of deposits into these accounts from FedEx Ground. Investigators' analysis of the SLTG FedEx Division's company accounts show that they do not have other business outside of FedEx Ground contracts.

78.     Based on its analysis, the Government sought and obtained a warrant from Chief Magistrate Judge Paul M. Warner, on or about October 24, 2019, to seize 11 percent of the funds in the Deposit Accounts. Pursuant to that seizure warrant, the Government seized the following amounts from the Deposit Accounts, which coincide with the accounts and amounts identified as Defendant Properties in Paragraphs 9(q) through 9(ff) of this Verified Complaint:

| Account No. | Deposit Account of SLTG FedEx Division Business | Amount of Funds Seized Pursuant to Criminal Seizure Warrant |
|---|---|---|
| ***421-3.9 | A&B | $7,506.97 |
| ***421-3.1 | A&B | $4,259.34 |
| ***165-9.9 | A&Y | $7,607.20 |
| ***165-9.1 | A&Y | $803.80 |
| ***112-1.9 | American Star | $7,211.45 |
| ***112-1.1 | American Star | $2,556.02 |
| ***371-8.9 | Big Dogs | $1,769.62 |
| ***371-8.1 | Big Dogs | $7,849.46 |
| ***748-9.9 | Costa | $14,291.38 |
| ***748-9.1 | Costa | $2,305.88 |
| ***126-1.9 | Eugene Trucking Inc | $2,843.47 |
| ***126-1.1 | Eugene Trucking Inc | $671.71 |
| ***125-3.9 | Falanga | $8,981.81 |
| ***125-3.1 | Falanga | $4,520.96 |
| ***625-6.9 | Fusion | $9,168.85 |
| ***625-6.1 | Fusion | $7,588.29 |

**FIRST CLAIM FOR RELIEF**
18 U.S.C. § 981(a)(l)(C)
(Wire Fraud Forfeiture)

79.     The United States incorporates Paragraphs 1-78 as though fully set forth herein.

80.     Under 18 U.S.C. § 981(a)(l)(C) "any property, real or personal, which constitutes or is derived from proceeds traceable to . . . any offense constituting 'specified unlawful activity' (as defined in [18 U.S.C. §] 1956(c)(7)" is forfeitable to the United States.

81.     "Specified unlawful activity" is defined at 18 U.S.C. § 1956(c)(7), *inter alia*, as "any act or activity constituting an offense listed in [18 U.S.C. §] 1961(1), and wire fraud in violation of 18 U.S.C. § 1343 is a listed offense and, therefore, a specified unlawful activity for purposes of forfeiture under 18 U.S.C. § 981(a)(1)(C).

82.     Title 18, United States Code, Section 1343, provides that:

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire . . . in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice shall be guilty of a crime.

83.     The SLTG FedEx Division, Tuchinsky, Barsukov, Tomilin, Teyf, Tsipelzon and Mower, along with others, having devised or intending to devise a scheme or artifice to defraud and for obtaining money or property by means of false or fraudulent pretenses, representations, or promises to deprive FedEx Ground of its honest and faithful services, used or caused someone to use a wire in interstate or foreign commerce for the purpose of executing such scheme and artifice, in violation of 18 U.S.C. §§ 1343, 1346 and 2. As a result of the scheme to deprive FedEx Ground of its honest and faithful services through bribes paid to Mower and other FedEx Ground employees, FedEx Ground made over 100 million dollars in payments to SLTG FedEx

Division.

84.     Therefore, the Defendant Properties are subject to forfeiture under 18 U.S.C. § 981(a)(1)(C) as property constituting, or derived from, proceeds of Section 1343 violations.

85.     The Defendant Properties are further subject to forfeiture under 18 U.S.C. § 984, which provides that identical property found in the same place or account as property involved in the violation of 18 U.S.C. § 1343 is subject to forfeiture, as long as the forfeiture action is commenced a year or less from the date the offenses occurred.

**S<small>ECOND</small> C<small>LAIM</small> F<small>OR</small> R<small>ELIEF</small>**
18 U.S.C. § 981(a)(l)(C)
(Travel Act Forfeiture)

86.     The United States incorporates Paragraphs 1-85 as though fully set forth herein.

87.     Under 18 U.S.C. § 981(a)(l)(C) "any property, real or personal, which constitutes or is derived from proceeds traceable . . . any offense constituting a 'specified unlawful activity' (as defined in [18 U.S.C. §] 1956(c)(7)" is forfeitable to the United States.

88.     "Specified unlawful activity" is defined at 18 U.S.C. § 1956(c)(7), in part, as "any act or activity constituting an offense listed in [18 U.S.C. §] 1961(1), and interstate travel or transportation in aid of racketeering enterprises in violation of 18 U.S.C. § 1952 is a listed offense and, therefore, a specified unlawful activity for purposes of forfeiture under 18 U.S.C. § 981(a)(1)(C).

89.     Title 18, United States Code, Section 1952(a) prohibits, *inter alia*, any entity who uses "any facility in interstate or foreign commerce" from distributing the proceeds of any unlawful activity, or otherwise promoting, managing, establishing, carrying on, or facilitating the promotion, management, establishment, or carrying on, of any unlawful activity.

90.     Title 18, United States Code, Section 1952(b) specifically includes within the

definition of "unlawful activity" any bribery in violation of the state law where it is committed.

91.     Utah Code § 76-6-508(1), in turn, makes it a crime for a person "when, without consent of the employer or principal, contrary to the interests of the employer or principal . . .  as an employee, agent, or fiduciary of an employee or principal, solicits, accepts, or agrees to accept any benefit from another upon an agreement or understanding that such benefit will influence his conduct in relation to his employer's or principal's affairs."

92.     SLTG FedEx Division, Tuchinsky, Barsukov, Tomilin, Teyf, Tsipelzon and Mower, along with others, used facilities in interstate commerce with the intent to both (1) distribute the proceeds of an unlawful activity; and (2) promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on of unlawful activity. Specifically, Tuchinsky, Barsukov, Tomilin, Teyf, Tsipelzon promoted SLTG FedEx Division, a business enterprise, by bribing Mower and other FedEx Ground employees to obtain and retain interstate FedEx Ground routes and business in violation of Utah Code § 76-6-508(1), and distributed proceeds that the SLTG FedEx Ground Division received from FedEx Ground as result of the violations of Utah Code § 76-6-508(1).

93.     Therefore, the Defendant Properties are subject to forfeiture under 18 U.S.C. § 981(a)(1)(C) as property constituting, or derived from, proceeds of Section 1952 violations.

94.     The Defendant Properties are further subject to forfeiture under 18 U.S.C. § 984, which provides that identical property found in the same place or account as property involved in the violation of 18 U.S.C. § 1952 is subject to forfeiture, as long as the forfeiture action is commenced a year or less from the date the offenses occurred.

## THIRD CLAIM FOR RELIEF
18 U.S.C. § 98l(a)(l)(A)
(Promotion Money Laundering Forfeiture)

95.     The United States incorporates Paragraphs 1-94 as though fully set forth herein.

96.     Under 18 U.S.C. § 981(a)(l)(A) "[a]ny property, real or personal, involved in a transaction or attempted transaction in violation" of 18 U.S.C. § 1956 "or any property traceable to such property" is forfeitable to the United States.

97.     Title 18, United States Code, Section 1956(a)(1)(A)(i), prohibits intentionally promoting or carrying on a specified unlawful activity by using property in a financial transaction "knowing that the property involved in [the] financial transaction represents the proceeds of some form of unlawful activity[.]"

98.     As set forth herein, the Defendant Properties identified at Paragraphs 9(h) and 9(j) constitute property, or property traceable to such property, involved in financial transactions involving the proceeds of specified unlawful activity, namely the illegal conduct described in the First and Second Claims for Relief, with such transactions intended to promote such specified unlawful activity and carried out with knowledge that the property represented the proceeds of illegal activity. These transactions include, but are not limited to those described in Paragraphs 61 thru 68 of this Verified Complaint.

## FOURTH CLAIM FOR RELIEF
18 U.S.C. § 98l(a)(l)(A)
(Expenditure Money Laundering Forfeiture)

99.     The United States incorporates Paragraphs 1-98 as though fully set forth herein.

100.    Under 18 U.S.C. § 981(a)(l)(A) "[a]ny property, real or personal, involved in a transaction or attempted transaction in violation" of 18 U.S.C. § 1957 "or any property traceable to such property" is forfeitable to the United States.

101.     Title 18, United States Code, Section 1957(a) prohibits knowingly engaging or attempting to engage in a monetary transaction in criminally derived property that has a value greater than $10,000.

102.     As set forth herein, the Defendant Properties identified at Paragraphs 9(l) through 9(p) of this Verified Complaint were involved in monetary transactions in violation of 18 U.S.C. § 1957, or are traceable to such property. Specifically, multiple transactions used to purchase the Defendant Properties involved more than $10,000 in proceeds from specified unlawful activities.

103.     Accordingly, these Defendant Properties are subject to forfeiture to the United States under 18 U.S.C. § 981(a)(1)(A).

### REQUEST FOR RELIEF

WHEREFORE, the United States respectfully asserts that there is reasonable cause to believe the Defendant Properties are forfeitable to the United States under 18 U.S.C. §§ 981(a)(1)(A), 981(a)(1)(C), and 984, and requests:

A.  That notice of this action be given to all persons known or thought to have an interest in or right against the properties;

B.  That the Defendant Properties be forfeited and condemned to the United States of America;

C.  That the Court decree, confirm, enforce and enter an Order of Forfeiture as to Defendant Properties to the United States of America; and thus order the Federal Bureau of Investigation, or its delegates, to dispose of the Defendant Properties as provided by law; and

D.  That the Court aware the United States all other relief to which it is entitled, including

the costs of this action and for such other and further relief as this court deems just

and proper.

Dated this 3rd day of April, 2020.

JOHN W. HUBER
United States Attorney


_____
CY H. CASTLE
MARK E. WOOLF
Assistant United States Attorneys

## ATTACHMENT A

| | | |
|---|---|---|
| a. | $468,252.34 | seized from AFCU account ending in***228-6.7 |
| b. | $22,736.22 | seized from AFCU account ending in***228-6.9 |
| c. | $5,819.95 | seized from AFCU account ending in***480-4.9 |
| d. | $233,425.41 | seized from AFCU account ending in***077-7.9 |
| e. | $2.91 | seized from AFCU account ending in***335-8.9 |
| f. | $99,319.86 | seized from AFCU account ending in***046-4.9 |
| g. | $2,970.35 | seized from Wells Fargo Bank account ending in ***8679 |
| h. | $64,165.93 | seized from AFCU account ending in***332-0.9 |
| i. | $54,164.94 | seized from AFCU account ending in***692-0.9 |
| j. | $224,379.15 | seized from AFCU account ending in***223-1.9 |
| k. | 2014 Mercedes Benz S550V4, VIN: WDDUG8FB0EA062249, seized in La Jolla, CA. | |
| l. | DRD Paratus 0.308 rifle, SN: 0064, seized in Cottonwood Heights, UT. | |
| m. | Tiffany & Co. Platinum, .90ct round brilliant diamond earrings, seized in San Diego, CA. | |
| n. | Tiffany & Co. Platinum, 18k yellow gold emerald and diamond ring with one emerald weighing 1 carat, flanked by triangular brilliant cut diamonds weighing approximately .40 ctw., G-H color range, VSI-VS2 clarity range, seized in San Diego, CA. | |
| o. | 18k drop earrings with 16 rose cut pear-shaped diamonds 9.51ct that have diamond halos (311 RB dias total) 2.89ct (12.40CTW), seized in San Diego, CA. | |
| p. | 18k flower shaped ring with pear-shaped brown diamonds 6.38CTW 1-RND brilliant diamond in the center .32CTW & 199 RND MELEE dias around brown dias & along shank 1.00CTW, seized in San Diego, CA. | |
| q. | $7,506.97 | seized from AFCU account ending in***421-3.9 |
| r. | $4,259.34 | seized from AFCU account ending in***421-3.1 |
| s. | $7.607.20 | seized from AFCU account ending in***165-9.9 |
| t. | $803.80 | seized from AFCU account ending in***165-9.1 |
| u. | $7,211.45 | seized from AFCU account ending in***112-1.9 |
| v. | $2,556.02 | seized from AFCU account ending in***112-1.1 |
| w. | $1,769.62 | seized from AFCU account ending in***371-8.9 |
| x. | $7,849.46 | seized from AFCU account ending in***371-8.1 |
| y. | $14,291.38 | seized from AFCU account ending in***748-9.9 |
| z. | $2,305.88 | seized from AFCU account ending in***748-9.1 |
| aa. | $2,843.47 | seized from AFCU account ending in***126-1.9 |
| bb. | $671.71 | seized from AFCU account ending in***126-1.1 |
| cc. | $8,981.81 | seized from AFCU account ending in***125-3.9 |
| dd. | $4,520.96 | seized from AFCU account ending in***125-3.1 |
| ee. | $9,168.85 | seized from AFCU account ending in***625-6.9 |
| ff. | $7,588.29 | seized from AFCU account ending in***625-6.1 |

**VERIFICATION**

I am a Special Agent with the Federal Bureau of Investigation, and declare under penalty of perjury, as provided by 28 U.S.C. § 1746, that I have read the foregoing Verified Complaint for Civil Forfeiture *In Rem*, and that the facts contained therein are based upon my personal knowledge or upon information I obtained in the course of my investigation and are true and correct to the best of my knowledge and belief.

Executed on this 3ʳᵈ day of April, 2020.

Trent Pedersen
FBI Special Agent

36